## THE COPPERFIELD.

(District Court, S. D. Florida. August 17, 1920.)

1. Salvage ⊗⊃26—Value of cargo salved not increased by freight prepaid.

Where a schooner laden with lumber, on a voyage from Mobile to a Spanish port, was stranded and brought by salvors into the port of Tampa, Fla., the value of the cargo at Tampa cannot be increased for salvage purposes by addition of the amount of freight prepaid, under a provision of the charter party that it should be considered earned and not returnable "vessel and/or cargo lost or not lost."

2. Salvage ⊗⊃26—Salvors not allowed for unnecessary expense.

Salvors of a stranded vessel *held* not entitled to an increased award by reason of their taking the vessel to a port over 200 miles distant, when there was a port equally available within 40 miles.

3. Salvage ⊗⊃21—Right to compensation forfeited by embezzlement of property.

The master of a salving tug, who took from the salvaged vessel nautical instruments, books and papers, and a boat, which were retained until after answer was filed in a salvage suit, excluded from participation in the salvage award, and allowance for salvage of such articles denied.

In Admiralty. Suit for salvage by the Gulf Refining Company against the schooner Copperfield and cargo. Decree for libelant.

McKay & Withers and H. S. Hampton, all of Tampa, Fla., for libelant.

Raney & Morris, of Tampa, Fla., and E. J. L'Engle, of Jacksonville, Fla., for claimant and others.

CALL, District Judge. The facts of this case may be stated in short as follows:

On August 25, 1919, the four-masted schooner Copperfield left Mobile, Ala., on her maiden voyage, bound for Alicante, Spain, loaded with some 550,000 feet of pine lumber in her hold and on deck. She proceeded on her voyage until September 8th, when she encountered such weather that she attempted to make Key West for an anchorage until the weather settled. No pilot coming aboard, the master tried, on the 9th, to beat into Key West Roads for anchorage; at 1:30 p. m., anchored with the port anchor; at 6 p. m., let go the starboard anchor. She rode by these until a third anchor was let go. On the 10th the hurricane struck her while riding with three anchors. This hurricane continued through the 10th and 11th, leaving the vessel with masts broken at the deck, jibboom gone, deck load partly washed overboard, and masts and rigging over the side, drifting, with anchor chains and hawser broken. The last entry in the log is on the 11th, and the crew must have abandoned the wreck between the 11th and the afternoon of the 12th, when she was sighted by Lieut. Roberts, some three miles from where she was found by the Senator Bailey. The Senator Bailey, an ocean-going tug belonging to the Gulf Refining Company, was at Port Tampa during the hurricane, and under orders from the owner left Port Tampa on September 13th, to look for the barge Monongahela, which had broken loose from the steamer towing her. On the 14th the barge was found and towed into the harbor of Key West, arriving on the 15th, in the early morning. The tug remained in the harbor of Key West through the day of the 15th, with instructions to remain in that harbor and take the barge out to meet the vessel from which she had broken loose, when she should arrive.

Under orders from the owner, the tug left Key West in the early morning of the 16th, to go out and render aid to the steamship Winona, then ashore not far from Tortugas. Arriving there, and finding that no aid could be rendered to the steamship, the tug started on her return to Key West, and while on her way discovered the Copperfield aground on Half Moon Shoal, about half past 4 in the afternoon. The schooner was aground about southeast from the buoy marking the western edge of the shoal, lying in a kind of bight or pocket. The chart shows the depth of water on the shoal to range from 2 to 3 fathoms. By using the lead line the Bailey approached to within 300 yards of the wreck, anchored, and sent her small boat and put a part of her crew aboard. By sounding from the small boat and from the tug, they succeeded in approaching within 75 feet of the wreck, and anchored about northeast from the wreck; the first anchorage having been about southwest from the wreck. The schooner was lying with her bow pointing about east. Afterward the Bailey was brought alongside the port bow of the wreck and made fast. The crew of the tug commenced to clear away the wreckage of spars, rigging, etc., which lay on the starboard side of the schooner, and continued this labor until about in the neighborhood of 4 o'clock in the morning of the 17th, using pocket flash lights and the searchlight of the tug to aid them. A

hawser belonging to the schooner was attached to the anchor chain hanging over the schooner's bow and carried aboard the tug, and the tug then commenced to pull, and in a short time cleared the schooner from the shoal.

The draft of the tug is left uncertain; no one apparently knowing what her exact draft was. It was somewhere between 11 and 14 feet, probably between 11 and 12. The draft of the schooner was probably in the neighborhood of over 16 feet.·

The entrance to Tampa Bay was some 190 miles away and Key West some 40-odd. The tug started for Tampa, towing the schooner by the hawser astern. The schooner had considerable water in her hold, her rudder was broken, steering gear out of order, and owing to the inability to steer her, and the water in her, sheered badly, and some two or three hours after the tow commenced, parted the hawser, and was then taken alongside, and during the remainder of the day of the 17th was towed in this manner. At nightfall she was dropped astern again, and thus proceeded slowly during the night, and next morning taken alongside again, and thus continued until the night of the 18th, when she was taken into Tampa Bay, and docked at Eggmont Key about 12 o'clock, midnight. Next morning she was taken to the city of Tampa, and tied up to the Seaboard dock.

During the 17th, while towing alongside the tug, the stern line parted, and it was necessary for the tug to use one of her wire cables to replace the broken hawser. During the 18th, the tug used her syphon to pump the water out of the schooner, thus lightening her.

It is claimed by witnesses that the vessel was hard aground and was pounding heavily, so heavily that it was difficult to maintain one's footing. This does not impress me as probable, taking into consideration the location and extent of the shoal, the prevailing wind, and the surroundings as delineated upon the government chart in evidence. Nor does the physical condition of the schooner as shown by the examination of her bottom in the dry dock lend credence to such claim.

That the service rendered was a salvage service and one of merit there can be no question, but that any great risk of life or property was incurred I do not find. Nor do I find any display of heroism in its rendition. The work of the crew was arduous, and continued over the better part of three days; but the explanation of why it was decided to make the longer trip to Tampa, some 230 miles, to the dock where the schooner was left, than the shorter one of 40-odd to Key West, is not satisfactory.

The effects of the hurricane on the water had·ceased before the discovery of the wreck by the Bailey, and there was ample water both in depth and extent to have taken the wreck into Key West. However, it might have been an error of judgment on the part of the master of the tug, and such error should not be visited upon the allowance to the libelant in this case. Nor do I think the increased time required to tow the wreck to Tampa, rather than to Key West, should be allowed to augment the amount as a salvage service.

The testimony of the officers of the tug does not impress me favorably. It impresses me that these witnesses systematically endeavored to

exaggerate the danger to the property salved as well as to the salving tug and salvors. I suppose this is natural, and is more or less apparent in salvage cases. Nor do I think the actions of the salvors, after the service was rendered, in delivering the salved property, to be commended. Certain of the ship's papers were delivered to the collector at Tampa, yet the vessel's log and charter party were retained by the master of the tug until the taking of testimony at Galveston, in January. Certain navigating instruments and books were taken from the schooner and retained until after the filing of claimant's answer charging such action. A small boat was taken from the schooner and placed on the Bailey, and carried by her to Port Arthur, and returned only after the filing of such answer, not to mention the disappearance of berth lamps and compass, canned goods from the stores, etc.

It is true the three officers testify that they knew nothing of the disappearance of these last-mentioned articles, but the explanation occurring to proctors for libelant that a fishing boat might have gone aboard and stolen the lamps, etc., does not impress me with its probability. The compass might have been taken by the crew when they abandoned the schooner, but certainly they would not have stopped to unscrew the berth lamps from the wall or take the barometer from the box. The writing on the wall, a copy of which was introduced in evidence by the libelants, shows that the crew left in too much hurry to stop to unscrew berth lamps and barometer boxes. Men who feel their lives in imminent peril would not stop for such matters. Had the wreck been boarded by another boat, the crew of the boarding boat would not have abandoned the opportunity of claiming salvage.

"Punctilious honesty is required of salvors. Embezzlement, however small in amount, whether at sea, in port or after the goods are in custody of the law, works a forfeiture of all salvage." "Embezzlement is ordinarily so secret and purely an individual act that its commission by one salvor, though a master, is held not to prejudice his cosalvors, or owner, who are innocent. It works a forfeiture of the guilty party only." Marvin, Wreck and Salvage, § 220.

"The merit is not in saving the property alone, but in saving it and restoring it to the owners. The compensation to be awarded, therefore, presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach, or under the control, of the salvors. Marvin, Wreck and Salvage, § 218.

[1] At the final hearing in this case libelants made a motion to amend their libel by claiming salvage on $35,826.25 freight money paid to the shipowners at Mobile, before the sailing of the schooner on her voyage under the stipulation of the charter party produced by the captain of the tug at the taking of the testimony in Galveston in January. The amendment is contested by the claimants of the ship and cargo. As I understand the contention of proctors for libelants, it is that the amount of freight money paid should, to that amount, increase the value of the cargo, because that amount was paid under a charter party which provided:

"Prepaid freight earned and due when paid, and not returnable, vessel and/or cargo lost or not lost."

That the files and stipulation filed in this cause show that the vessel was repaired, cargo reloaded, and vessel proceeded on her voyage.

Admiralty is generous in allowing amendments, in order that full justice may be done in the case and the allegations of the libel made to correspond to the proofs adduced. In this case knowledge of the contents of the charter party must be charged against the libelants at least from the taking of testimony in Galveston in January, and notice of the motion was not served upon proctors of claimants until July 15th, the final hearing being on the 19th. No excuse is offered for the delay, and that is urged as an objection to the amendments; but, as I do not see how the claimants are injured by allowing it, I will therefore grant the motion.

As I understand, the principles governing the allowance of salvage on freight money earned, where the voyage is interrupted, would not apply in this case. The effort is to increase by the amount of such prepaid freight the value of the cargo salvaged and delivered at Tampa. Does the fact that the charter party provided that "prepaid freight earned and due when paid and not returnable, vessel and/or cargo lost or not lost," and said freight was prepaid on a voyage to Alicante, Spain, increase the value of said cargo when the voyage was interrupted by a peril of the sea, at the port of Tampa? I fail to follow the course of reasoning by which the result is reached. It is admitted that the vessel is not benefited, or value thereby increased. On the contrary, it is admitted that it is rather a detriment to her, because she had to be repaired to complete her voyage, for which the freight money had been paid. To say that the value of a cargo of lumber, of the highest value by the witnesses of some $16,000, is increased by payment of freight under the stipulation of the charter party to $50,000, is going farther than I can follow. As I understand the law, the value of the cargo upon which salvage will be awarded is at Tampa, the port to which the salvors took it.

The Copperfield was a wooden, four-masted schooner of the value, in her wrecked condition, of $34,000 or $35,000. The cargo I find of the value of $12,000, from which must be deducted the costs of unloading same, advanced by one of the libelants. The tug Senator Bailey is an iron tug of the value of from $150,000 to $175,000.

[2] In finding the award in this case, I am laboring under the difficulty to understand why the officers should have taken the derelict something more than 200 miles, instead of to Key West, where the tug had been ordered to await the coming of the steamer Ligonier. In case the wreck had been taken to Key West, the salvage service would have been completed by the afternoon of the 17th, had the same rate of speed to Tampa been maintained. As it was, it was the afternoon of the 19th before delivery was made at Tampa. Therefore, in fixing the award, I shall consider the danger to the salved property and its value, the danger to the tug and its value, the labor of and danger to the crew in clearing the wreckage of spars, rigging, etc., from the hull of the schooner, and, in addition, the service for a reasonable time in delivering the salved property to a safe port.

The libelants in their libel ask for a percentage of the value of the

property salved. I understand that the rules for fixing salvage of abandoned or derelict property are not other or different from those for fixing salvage in any other case. I find the value of the salved property to be as follows:

| | |
|---|---|
| Value of vessel | $35,000.00 |
| Value of cargo | 12,000.00 |
| Total value | $47,000.00 |

—less cost of unloading same. Considering the arduous labor of the crew in clearing masts, rigging, etc., from the vessel, and clearing her from the sand, the libelants should be liberally rewarded for this service, and I award the libelants the sum of $12,000; for the service of towing the wreck from Half Moon Shoals to Tampa, the sum of $1,200—making a total of $13,200; this amount to be divided, two-thirds to the tug and one-third to the crew; this amount to be divided between the vessel and the cargo in proportion to the value of each as found above, the proportion allotted to the crew to be divided among them in proportion to the wages received by each.

In addition the Gulf Refining Company must be reimbursed the sums expended for pilotage from outside the bar to Tampa, for the vessel, $114, and the cost of unloading the cargo from the wreck. The cost of moving the tug from Tampa to Port Tampa, is disallowed, as constituting no part of the cost of the salvage service.

The question of the broken dolphin at Egmont Key presents a more difficult question. The testimony is not clear as to how the accident happened. I am unable to say it was faulty navigation on the part of the officers of the tug, or one of those accidents which might occur, however careful the navigation might have been. I have therefore divided the cost of replacing the dolphin between the salved property and the owners of the tug, and allow the Gulf Refining Company the sum of $300.

The Gulf Refining Company must also be reimbursed for the following expenses incurred in caring for the salved property, as follows:

| | |
|---|---|
| Welding pump | $ 2.00 |
| Amount paid to mechanic working on pump | 19.93 |
| Straightening crank shaft of pump | 2.40 |
| Insurance premiums on cargo while in storage | 401.50 |
| Lamp cord and battery | 4.96 |
| Cleaning cabin | 10.00 |

The items of unloading cargo and insurance on same to be charged to and paid by the cargo.

[3] Certain nautical instruments and books and a small boat were taken from the wreck, and the instruments, books, and papers were retained by the captain of the tug until after answer filed by the claimant, when the same were returned. The log, charter party, etc., were retained until the hearing had at Galveston, in January of this year. Such conduct must not receive the approval of a court of admiralty. Again, his conduct in carrying the schooner's boat to Port Arthur has not been satisfactorily explained, nor the reasons for taking the same on board the Bailey. When he left Tampa with his tow of oil barges,

it is taxing my credulity too much to believe that it was an oversight. To my mind it carries the impression that there was too little regard for the rights of the owners of the salved property. It was not that care of the property of others exacted of salvors, who are asking to be remunerated for saving same. While I do not think the evidence is such that I can visit this conduct upon the other salvors, it is necessary that the court should visit it upon the guilty party, and this I do by depriving the master of the tug of all participation in the salvage awarded the crew; the master's share to inure to the benefit of the claimants of the schooner and cargo, in proportion to the value of each as found above.

The libelants ask salvage for saving the boat, instruments, etc. For the reasons given above for forfeiting the tug master's share of the salvage awarded, such claim is disallowed.

A decree in accordance with the above will be made.