## THE PERRY SETZER.

(District Court, S. D. Florida. March 3, 1923.)

No. 1267.

1. **Salvage 22—Evidence held not to show negligence of salvor in selecting anchorage.**

In suit for salvage, evidence *held* not to support claim of cross-libel for damages for negligence of salvor in selecting anchorage for vessel.

2. **Salvage 48—Evidence held not to show vessel unseaworthy.**

In suit for salvage against vessel and cargo, evidence *held* not to support claim of claimant of cargo that the cargo should be relieved from payment of any part of the salvage, because the vessel was unseaworthy when she broke ground for the voyage.

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Salvage** ⊚⇒47—**Question of relief of cargo from payment of salvage could not be raised by answer of cargo claimant.**

In suit for salvage against vessel and cargo, *held*, that the question whether the cargo should be relieved from payment of any part of the salvage, because the vessel was unseaworthy when she broke ground for the voyage, could not be raised by the answer of the cargo claimant.

4. **Salvage** ⊚⇒30—**$2,000 allowed for salvage of water-logged lumber schooner ashore in light weather.**

In suit for salvage of water-logged schooner worth about $25,000, carrying lumber of equal value, ashore in light weather, an award of $2,000 for services *held* proper.

5. **Salvage** ⊚⇒18—**Messengers from salvaged vessel held not entitled to salvage.**

In suit for salvage of lumber schooner, *held*, that shrimp boat, which took the vessel's message for assistance, and the pilot, who telephoned the message to libelant's office, were not entitled to salvage.

6. **Salvage** ⊚⇒18—**Owners of tug chartered by salvor held not proper parties to libel.**

In suit for salvage of lumber schooner, *held*, that the contention that the libelant was not entitled to salvage for the work of a tug chartered by it, and that the owners of the tug should be made parties to the suit, was not tenable.

In Admiralty. Libel by the Jacksonville Forwarding Company against the schooner Perry Setzer and cargo. Decree for libelant.

George C. Bedell, of Jacksonville, Fla., for libelant.

E. J. L'Engle, of Jacksonville, Fla., for claimant of the ship.

Kay, Adams & Ragland, of Jacksonville, Fla., for claimant of the cargo.

CALL, District Judge. The schooner Perry Setzer sailed from St. Andrews Bay on December 5, 1920, loaded with lumber, bound for a South American port. In going to sea she struck bottom twice, at one time pounding heavily on the bottom. At the time of breaking ground she was leaking a little, not more than ordinary wooden vessels. After striking bottom, sounding of the wells showed no increase in leaking. The vessel encountered heavy weather, when the leaks increased, necessitating the continual use of her pumps to keep her clear of water. She was equipped with two steam pumps, one of 7 inch and one of 5 inch. The horse power of the boiler to operate these pumps is not given in the testimony. Under the continued strain, the boiler commenced to leak and the pumps would require repairs, and during the time taken to make these repairs the water would gain such headway that on the 14th of December the master decided to beach the vessel to prevent her sinking. This he did about 5 o'clock on the afternoon of December 14th, a short distance to the north of Nassau Inlet, on a bank designated by the St. Johns river pilots as the "breakers," some mile or mile and a quarter from the beach line, where she lay during that night. The wind was blowing a light breeze from the westerly; sea smooth. On the morning of the 15th a shrimp boat came alongside, and the master of the vessel gave one of the men a penciled note to the effect that his vessel was water-logged and beached, and asking for tug and lighter. Subsequently, that same morning, two of the pilots came aboard for

an hour, and returned to Mayport and telephoned the position of the schooner to the office of libelants.

The libelants' manager went to Mayport in an automobile and boarded the Volunteer, a tugboat owned by libelants, and went to the schooner's assistance, arriving about 12 o'clock of the 15th; went alongside, and passed her hawser, which was made fast to the schooner's quarter. She pulled for about an hour without effect. She then went to the port side of the schooner and attached her steam hose to the schooner's pumps and commenced pumping, and continued this service until about 10:45 that night, when the schooner was floated. At about 2 o'clock that afternoon the Three Friends arrived at the schooner, and, going on the starboard side, rigged a steam syphon and pumped water from the vessel until 7 or 8 o'clock that night, when she took out the syphon and ran a 10-inch hawser to the schooner's quarter; ran out her anchor and dropped back, making the chain cable of her anchor fast to her steam winch, so as to add the pull of the steam winch to the pull of her propeller in going ahead. At about 9 o'clock the Three Friends commenced pulling ahead at full speed, at the same time working her steam winch, while the Volunteer shoved with what steam she could spare from the pumps. This continued until about 10:45 p. m. when the vessel came off for a short distance, and then, fetching up for a few minutes, came off and was towed into deep water.

On account of the vessel having so much water in her, it was found necessary to make the Volunteer fast to her quarter in order to steer her, while the Three Friends towed ahead. In this way the schooner was brought to St. Johns bar, about 6 miles, and up the river to Mayport, where she was anchored about 2 o'clock on the morning of the 16th, and remained anchored until about 8 or 9 o'clock, when with both tugs alongside she was towed up the river and anchored on the south side of the river opposite Commodores Point. This occurred about 1 o'clock in the afternoon of the 16th. The master of the vessel then went ashore on one of the tugs, presumably to make arrangements for procuring gasoline pumps to clear his vessel of water and to have a survey of the vessel made for the underwriters. No pumping had been done aboard the schooner since the Volunteer had disconnected her steam hose from the pumps of the schooner. After the vessel had been anchored, the tide fell, and the stern of the schooner came in contact with something on the bottom, and the bow was submerged, necessitating that the forecastle and galley be vacated. By this submergence much of the ship's stores, consisting of foods, etc., were destroyed. Subsequently the vessel was pumped out and removed to the docks at Commodores Point, where the cargo was unloaded, and the vessel put upon dry dock and repaired. The cargo was reloaded and vessel proceeded on her voyage.

The Volunteer was about 85 feet long, with engines of 350 horse power. The Three Friends was larger, with 500 H. P. engines, and operated by libelants under charter, at $40 per day; the libelants paying for stores, crew, etc. The Perry Setzer was a four-mast schooner of some 1,800 tons dead weight burden, and loaded with 830,000 feet of lumber. No values of the two tugs were shown in the evi-

dence. The value of the schooner was about $25,000, and the value of the cargo about $25,000, in its condition when brought to Jacksonville. The testimony shows the value of the schooner in a seaworthy condition at between $30,000 and $35,000, but I think, considering her condition, water-logged, leaking, some of her planks started, and caulking virtually gone on some of her seams, the value above fixed is fair. The effect of the grounding of the stern when at anchor off Commodores Point was to shove the rudder stock up through the rudder well, breaking the planks covering same, and doing some damage to the deck planks surrounding the well, shoving up the fastenings holding the rudder in place, and necessitating the replacement with a new rudder.

[1] The claimant filed a cross-libel, alleging negligence on the part of the salvors in anchoring the schooner in the position in which she was anchored, and claiming damages resulting from such negligence, to wit, the damage to the rudder and loss of stores resulting from such negligence. The question, therefore, under the cross-libel, is: Was Capt. Spaulding, who directed the anchoring of the schooner, negligent in selecting the location of such anchorage? It is evident from the testimony that this location was that usually and ordinarily used by vessels lying at anchor in the harbor. The schooner was water-logged, and must have been drawing considerably more water than when she left St. Andrews Bay, which was 21 feet forward and 21.8 feet aft. The plat from the engineer's office shows the water in the location where the schooner was anchored outside the channel to have varied from 31.8 to 21.5 feet in depth. While the anchorage was selected by Capt. Spaulding, I am impressed by the testimony that the master of the schooner desired that his vessel should be anchored rather than put on a mud flat, as suggested, and that the captain acted in compliance with the wishes of the master, who evidently intended and expected to make arrangements for pumps to keep his vessel clear of water. Under the testimony I do not think the damage which may have resulted to the schooner from the stern going aground can be attributable to any negligence by the salvors in selection of the place of anchorage. The cross-libel will therefore be dismissed.

[2] The South American Shipping Company filed its claim to the cargo of lumber and its answer to the libel herein, whereby it sought to have any salvage allowed in this case assessed against the schooner, and to relieve the cargo from payment of any part of same because the vessel was unseaworthy at the time she broke ground for the voyage. The unseaworthiness is alleged in the condition of the boiler and pumps of the schooner.

[3] I am of opinion from the testimony that the boiler and pumps of the schooner, while they were old, were amply able to care for the ordinary leak of the schooner, and it was only when they were subjected to the extraordinary strain of continual use after the vessel had encountered heavy weather and the leaks increased, probably due to the grounding in coming out of St. Andrews Bay, together with the heavy weather encountered, that they were unable to do

so. Nor does it seem to me that the master could be charged with negligence in continuing the voyage after the grounding in St. Andrews Bay. But, aside from this, it seems to me to be the law that this question cannot be raised, as was sought to be done in this case, by the answer of cargo claimant. The case of The James Turpie (D. C.) 113 Fed. 700, settles this question adversely to cargo claimant.

[4] I come now to the question of salvage and the amount to be allowed. Was the schooner in danger? I think undoubtedly she was. Water-logged and ashore on the sands off Nassau Sound, exposed to any sea which might come from the Atlantic Ocean. It is well known that a vessel ashore on the sands of this coast works down in the sand with the movement of the vessel caused by the waves. This vessel went ashore at low water in the afternoon, and it is apparent there was considerable movement at high tide that night and next day. Had it not been that the winds were light and from the westward, and little sea running, it is extremely doubtful whether she would ever have gotten off.

Were the rescuing tugs in danger? I think not. There was ample water at all times around the schooner for them; the Volunteer drawing 8 feet, and the Three Friends drawing 11 feet. There was no occasion for bravery on the part of any member of the crews of the tugs. The service was prompt and the operation skillful. It is unquestionably a salvage service, and the amount allowed should be such as will fully compensate for the service rendered and to encourage others to render such service to vessels in distress, but not such an amount as will be oppressive to the owners, or which will encourage the cupidity of others rendering like service.

The Volunteer left Jacksonville about 9 o'clock, stopped at Mayport for the general manager, and proceeded to the vessel, arriving about 12 o'clock; the Three Friends left at about 11 and arrived at the schooner about 2 p. m. From the time of arrival until the schooner was anchored off Commodores Point they were engaged in the operation. I do not think this is a case where the service may be divided into salvage and towage. The services rendered were necessary to make the salvage effective. The time the Volunteer was engaged was about 29 hours, and the Three Friends about 27 hours. There were some 17 or 18 men employed in the service. The testimony fails to show the wages of the crews of the tugs. It does not show the amounts usually received by the tugs for services rendered.

The charter money paid by libelants for the Three Friends cannot be taken into consideration, for the reason that this amount was paid for the boat each day, without crew or stores of any kind. But taking all the circumstances into consideration and bearing in mind the well-established rules for fixing salvage awards, I am of opinion that $2,000 is ample; three-fourths to go to libelant and one-quarter to the crews of the tugs, to be divided among them in proportion to the wages of each.

[5] Now it is contended that two others were entitled to salvage, the shrimp boat which took the message, and the pilot who telephoned the message to libelants' office. I do not think this contention well taken.

[6] It is also contended that libelant is not entitled to recover salvage for the work of the Three Friends; that the owners of the tug should be parties to this suit. I do not think this position well taken, nor supported by the cases relied on, under the facts of this case. Parsons on Maritime Law, vol. 2, p. 609.

A decree will be prepared in conformity with this opinion, requiring the amount allowed to be paid by vessel and cargo in proportion to the values as found herein, together with interest at 6 per cent. from the date of filing the libel.

The libel sought to impound the freight money, but no evidence was introduced on the issue made thereon by the libel and answer of the claimant of the vessel.

The costs of this proceeding will be taxed against the vessel and cargo in the like proportion as the salvage.