**BEACH SALVAGE CORPORATION OF FLORIDA, Libelant,**

v.

**THE Shrimp Boats CAP'T. TOM and THE TOM R. JR., their tackle, apparel and equipment, Respondents.**

No. 281.

United States District Court
S. D. Florida.

Aug. 18, 1961.

Louis Kurz, Jr., Ragland, Kurz, Toole & Martin, Jacksonville, Fla., for libelant.

Harry B. Fozzard, Jacksonville, Fla., for claimant.

SIMPSON, Chief Judge.

THIS CAUSE coming on for hearing upon the Amended Libel and Answer thereto, Counter Claim against the Libelant and Answers thereto, Intervening Libel and Answers thereto, and testimony having been taken before the Court without a jury, the Court makes the following findings of fact:

That the Shrimp Boats "CAP'T. TOM" and "TOM R. JR.", while proceeding from Charleston, South Carolina, to St. Augustine, Florida, went ashore on the beach approximately one-half mile South of Ponte Vedra Innlet at approximately 5:00 A.M. in the morning of November 27, 1960, which was two hours after high water. The "CAP'T. TOM" was under the command of Prince Green, a Negro, and the "TOM R. JR." was under the command of Reuben Taylor, a Negro, in addition to which there was one extra man for crew on each of said boats. At the time said vessels went ashore there was a heavy fog and the sea was calm except for ground swells. The Coast Guard Marine & Air Emergency was notified of these vessels being ashore and their approximate location. The Captain of the Port's Office notified one of the officers of the Libelant about 7:00 A.M. and the 95' Coast Guard Cutter was notified about 10:20 A.M. Lt. Edwards, Acting Captain of the Port, went to the scene of the stranding arriving shortly after 8:00 A.M. The 95' Coast Guard Cutter proceeded to the scene and arrived at 11:10 A.M. An officer of the Libelant appeared on the scene at approximately 8:00 A.M. and the equipment of the Libelant, under another officer of the Libelant, arrived at approximately 10:00 to 11:00 A.M. This equipment consisted of a used dukw; 3 spools of ½" steel cable, approximately 500 feet to each spool; some pumping equipment; a gasoline auxiliary wench; some anchors; 2 sections of polypropylene line; shackles and cable slings, all of the approximate value of $2,000.00 to $5,000.00. With the equipment there were four men. It appears that no contract arrangements were made between the Libelant and the Masters of the vessels with respect to salvage. Upon the arrival of the equipment the Libelant promptly proceeded to run anchors out from the booms of the shrimp boats astern and at approximately 45° angles from each other. Libelant also proceeded to fasten slings to

the rudders of each of the boats, the rope slings being fastened to the rudder stock and taken over the stern and the cable slings being fastened to the rudder shoe. The "TOM R. JR.", prior to her stranding, had torn up a clutch while trying to leave the beach and upon her stranding had driven a piston through the block of her engines and had also, upon stranding, put a quantity of fuel oil in the bilge of the boat, which the Libelant proceeded to pump out. Each of the boats was headed almost directly onto the beach or at nearly right angles and at low tide were out of the water. It further appears that the Master of each of the boats had an anchor and anchor lines out which the Court finds were ineffectual and which anchors were either taken in and placed aboard the boat or were utilized with the equipment on each boat. The Coast Guard Cutter # 95324, under the command of Lt. Alexander R. Larzelere, passed the messenger line from the Cutter to the dukw and in turn the hawser was placed ashore and fastened to the rope which was to the rudder stock of the "TOM R. JR." and the Cutter started pulling on that boat at 12:30 P.M. and she was free at 12:50 P.M. and was towed by the 40′ Coast Guard Cutter out to deep water. The Cutter then passed the messenger line to the dukw which carried same ashore and the hawser was secured to the line fastened to the rudder stock of the "CAP'T. TOM" at approximately 1:50 to 1:55 P.M. and the "CAP'T. TOM" was free of the beach between 1:50 and 2:00 P.M. This latter boat used her engines in freeing herself from the beach with the help of the Cutter. After said vessel was free, one of the officers of the Libelant dove over and cut the rope loose. At the time of the arrival of the Coast Guard Cutter on the scene and at the time that each of said boats was removed from the strand, the wind was light and the sea calm except for a moderate to heavy ground swell as shown by the log of the Coast Guard Cutter. High water at that location was at 3:24 P.M. in the afternoon, thus the "CAP'T. TOM" was removed from the beach between an hour and 25 minutes to an hour and 35 minutes before high water and the "TOM R. JR." was removed from the beach between 2 hours and 35 minutes to 2 hours and 45 minutes prior to high water. In the operation the Libelant lost one 75 pound anchor, one batch of tools worth approximately $15.00 to $25.00, and suffered about $25.00 damage to the dukw.

After the removal of the "CAP'T. TOM" and the clearing of her propeller she was able to proceed to Diesel Shipbuilding Company under her own power with one of the officers of the Libelant aboard, arriving there that afternoon. The "TOM R. JR.", being without propelling machinery and in a very serious leaking condition, was using the pump placed aboard by the Libelant and under control of one of the officers of the Libelant assisted by a member of the Coast Guard and was taken in tow by the 95′ Cutter and towed to Mayport. The weather conditions at that time were increasing fogginess, low visibility and ground swells. Because of the damage done to the rudder of the "TOM R. JR." she was unable to be steered and in being towed lay off the beam of the Coast Guard Cutter until she was docked by the Coast Guard at Montey's Marina in Mayport and there the Coast Guard man was taken off and the crew of the vessel and a representative of the Libelant remained aboard until a tug that had been ordered by the Libelant reached her the next morning and towed her over to Diesel Shipbuilding Compay. On Sunday, November 27, 1960, an officer of the Libelant communicated with the owners of the vessels in Charleston, South Carolina, and they met at Diesel Shipbuilding Company the following morning when the "TOM R. JR." was placed on the lift and emergency repairs made totaling $230.43. The vessel was floated on the evening of November 28, 1960, and this Libel was filed on the morning of November 29, 1960, against both vessels. The Marshal seized said vessels under monition of this Court, the "CAP'T. TOM" being at Bellinger Ship Yard on Atlantic Boulevard and Intercoastal Waterway and the "TOM R. JR."

being at Diesel Shipbuilding Company on the other side of the road on Atlantic Boulevard and Intercoastal Waterway.

The question to be decided by this Court on the above undisputed facts is what award should be made to the Libelant for the work, labor, materials and services rendered by it in connection with the successful removal of the Shrimp Boats "CAP'T. TOM" and "TOM R. JR." There is an incidental question raised by the claimant as to the negligent manner in which the Libelant acted in performing its services and labor which is alleged to have caused excessive damage to the two boats, or rather the failure on the part of the Libelant to use proper skill. The Court believes that this should be considered in connection with the amount of the award to the Libelant or in the assessment of any costs and will be taken into consideration by the Court in making such an award.

In considering the amount to be awarded as compensation, the Supreme Court of the United States, in the case of The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870, has outlined the elements to be considered:

1. "The degree of danger from which the lives and property were rescued."

The Court is of the opinion that any vessel aground on the beaches of Northern Florida is in danger even though the weather conditions may not be too unfavorable, and there is no testimony to show that either of these two vessels was in imminent danger of being broken up because of high seas or heavy winds, the only testimony being that at the time the sea was calm, the weather foggy and the wind light, and the fog continued after said vessels were removed from the beach. The Court further finds that the Masters of each of these boats had not taken sufficient precautions to prevent said boats from going further up on the beach. However, low water was not until an hour after a representative of the Libelant appeared on the scene. There appears from the evidence, however, that two Coast Guard Cutters arrived at the scene at ap-

proximately 11:10 A.M. and were available to assist the boats even though the Libelant had not been there. In addition thereto Lt. Edwards, Captain of the Port's Office, was on the scene earlier to direct operations in the event no one was there to salvage said vessels. While the availability of this aid does not eliminate the peril which the vessels may have been in, yet it does affect the degree of peril and as the evidence shows, both of said Coast Guard Cutters, namely a 40' Cutter and a 95' Cutter, did assist in the removal of said boats and without their assistance there is doubt as to whether or not at least one of the boats could have been effectively removed from the beach.

2. "The value of the property saved."

There is considerable disputed testimony as to the value of the property. The hull of the "CAP'T. TOM" was built in 1956 by Antonio Serras of St. Augustine, being 56' in length by 17' beam at a cost of $5,500.00. The records of the Claimant show a total cost for engines, equipment and hull of $16,000.00 and further show that in 1960 said vessel was appraised for estate purposes at $16,000.00, the same cost as new, and that she was in much the same condition as when appraised, ordinary wear and tear excepted. The Libelant's witnesses testified that she was worth between $18,500.00 and $21,500.00, and the Libel alleged a value of $17,918.00. The "TOM R. JR." was built in 1953, the hull being 55' in length by 17' beam, at a cost of $6,000.00 and her total cost new, as shown by the records of the Claimant, was $15,000.00. She has been appraised for estate purposes in 1960 at $13,000.00 and recently her clutch has been rebuilt, although at the time of the stranding it was stripped. The value as fixed by Libelant's appraisers was $17,500.00 and $13,500.00 respectively, both figures counting that the engine was in workable condition, and the Libel alleged $14,733.00. In order to put the engine in working condition, repairs were necessary on her block which was damaged by a piston going through same at an estimated cost of $2,500.00 to $3,500.00, and

clutch repair was estimated at $2,500.00. It is further shown that the repairs necessary to fix the hulls of the "CAP'T. TOM" and "TOM R. JR." would be $490.04 and $799.74 respectively, in addition to the repairs to the engine. There was further testimony that the "TOM R. JR." would not be in good condition even with those repairs, and there is testimony to the fact that the sales value of the hull, with the damaged machinery aboard, would be between $3,500.00 and $4,000.00. The Court is of the opinion, considering all of the evidence with respect to the vessels, that the value of the "CAP'T. TOM" at the time of her stranding was *$16,000.00* and the value of the "TOM R. JR." at the time of her stranding was *$7,000.00*.

3. "The risk incurred by the salvors in securing the property from impending peril."

The testimony shows that part of the equipment of the salvors was a dukw which was used for the purpose of running anchor lines from each of the stranded vessels out into the water and in bringing ashore the messenger line from the Coast Guard Cutter to the stranded vessel. A dukw is an amphibious vehicle designed for war use for the purpose of landing men on the beaches and has the ability to travel on both land and water, and by nature is a very tricky vehicle to operate in any degree of surf. While an examination of the exhibit filed in evidence shows the surf was not high, yet it appears there was a moderate to heavy ground swell, which made the navigation of this vehicle extremely difficult. The placing of anchors and running of lines by a vehicle of this character is, of course, somewhat perilous. Since it appears from the evidence that each of the Coast Guard Cutters had as a part of their equipment a gun for the purpose of shooting lines to the shore, the necessity of using the dukw for the purpose of running the tow line, while it may have been easier, was not absolutely necessary. Therefore, if there was any peril at that time it could have been avoided. It further appears from the evidence that one of the vessels, namely the "CAP'T. TOM", had been previously grounded on the South Carolina Coast and was removed from the strand with the aid of a Coast Guard vessel by shooting the line ashore and fastening same to a bridle around the vessel.

4. "The promptitude, skill and energy displayed by the salvors in rendering service and saving property."

The evidence shows that the Libelant was notified by the Coast Guard that the vessels were ashore at approximately 7:00 A.M. in the morning and the first officer of the Libelant was at the scene at approximately 8:00 A.M. and the dukw and equipment were at the scene at approximately 10:00 A.M. The evidence further shows that the 95′ Coast Guard Cutter was notified at approximately 10:20 A.M. and was at the scene at approximately 11:10 A.M. even though the condition of the weather was foggy and navigation somewhat difficult. The Court finds that this action was prompt.

The Libelant immediately went to work as soon as the equipment was on the scene fixing bridles, running anchor lines and performing other miscellaneous services and, therefore, the Court finds they were energetic.

With respect to the skill employed, the Court finds that the Libelant attached a rope sling to the rudder stock and a cable sling to the rudder shoe which were laid to the deck of each boat for the purpose of fastening to a tow line or other equipment for the removal of said boats. The Court finds that anchors and anchor lines were run from the booms to the cable and drums of the "CAP'T. TOM" and to a portable winch fastened to the deck of the "TOM R. JR." in view of the fact she had no motor power. These lines were run for the purpose of straightening up said vessels and to hold them off the beach. The first boat removed from the beach was the last one to go ashore, namely the "TOM R. JR.", which was also the smaller of the two boats, by fastening the tow line from the 95′ Coast Guard Cutter to the line fastened to the rudder stock. This boat was severely damaged in its removal which took place approxi-

mately 12:50 P.M., which was 2 hours and 35 minutes before high water. The damage consisted of a bent and jammed rudder, loosening of planks on the garbord, opening of seams in the stern, and other miscellaneous damage which cost approximately $799.74 to repair. The anchor and lines on this boat were used for the purpose of keeping her erect while being removed.

In the case of the "CAP'T. TOM" the tow line from the Coast Guard Cutter was fastened to the lines attached to the rudder stock and the anchor lines were used for the purpose of holding her erect and she was removed from the beach between 1:50 and 2:00 P.M., using her engines as well as the pull of the Coast Guard Cutter, and her damage totaled approximately $490.04.

The Claimants produced an expert witness who had had considerable experience in salvage operations all on the Florida Coast and Bahamas over a period of some 64 years, who testified that in his opinion a proper method of salvage operations would have been to run the anchors with as long a line as possible out into the sea from directly astern of the vessels since these vessels were lying bow to the beach; fasten said lines to the strongest part of the ship which would be the mast if the same went through the deck or if that was not the strongest portion, then to a bridle placed all the way around the boat at about deck level, with a constant strain kept on the anchor lines so that the boat would work itself out as the tide rose. That a second anchor line should be run from the stern as far out as possible against the set of the current or the waves with a strain constantly on this line also to off-set the action of the waves or current. The witness further testified that a line to the rudder stock was a very poor place to put a line in view of the fact that at the rudder stock any shrimp boat is very weak and the danger of serious damage to the boat is very possible. The witness also testified that the placing of a bridle to the rudder shoe was almost useless for the simple reason that the rudder shoe was not built to take any strain at all. The witness testified that anchor lines run from the booms for the purpose of righting the vessel is the wrong approach because a vessel laying over has a greater buoyancy than one up straight unless there is sufficient water to float the entire vessel, but if the anchor lines are run from the booms for the purpose of rocking the vessel, they would be of assistance in loosening the boat from the sand. The witness further testified that the removal of the boats, one 2 hours and 35 minutes before high water and the other 1 hour and 25 minutes to 1 hour and 35 minutes before high water indicates that the vessels were in position to be easily removed from the beach. The witness further testified that the amount of damage done to said vessels indicates that the vessels were not imbedded in the sand and the operation of the towing equipment was done skillfully. The witness further testified that in his opinion and with his knowledge of Florida beaches that the picture taken at the time shows that the sea was calm, although there was some ground swell.

The Court finds that the Libelant was both energetic and prompt but that its knowledge of salvage proceedings was lacking and that the skill exhibited by the salvors was of a minimal degree, even though the salvage operation was a success.

5. "The value of the property employed by the salvors in rendering their services and danger to which the property was exposed."

There is some variation in testimony by the Libelant as to the value of the property employed by it. The Court finds that the value of the property the Libelant used was between $2,000.00 and $5,000.00. In addition to the above the United States Coast Guard had on the scene two Cutters, one a 95' Cutter and one a 40' Cutter, both of high value, and without the use of these Cutters the salvage operations would not have been successful at that time. The danger to the property of the Libelant has previously been discussed and there was no danger to either

of the Coast Guard Cutters even though conditions were foggy as the sea was calm and the swells were merely ground swells.

6. "Time and labor spent by the salvors in rendering salvage services."

The Libelant had a man on the scene at 8:00 A.M. in the morning. The equipment was on the scene at approximately 10:00 A.M. Both boats were removed by 2:00 P.M. A man remained aboard the "CAP'T. TOM" until she arrived at Diesel Shipbuilding Company at 6:30 P.M. On the "TOM R. JR." there was a man from the Libelant and a pump until 10:00 A.M. the following day when the vessel arrived at Diesel Shipbuilding Company. The Coast Guard 95' Cutter was alerted at 10:20 A.M. and proceeded immediately to the scene. There is no testimony as to when the 40' Cutter left nor from where. The 95' Cutter anchored; passed the tow line first to the "TOM R. JR." and removed that vessel; passed the tow line to the "CAP'T. TOM" and removed that vessel; placed a man aboard the "TOM R. JR." until she reached Mayport. The 40' Cutter towed the "TOM R. JR." out to deep water and the 95' Cutter towed the "TOM R. JR." from the scene of the stranding to Mayport, docking her at Montey's Marina at 6:10 P.M. In addition to the above, the Libelant had the "TOM R. JR." towed from Mayport to Diesel Shipbuilding Company, a distance of approximately four miles, for emergency repairs and ordered and directed that such repairs be made, which was done.

The Court finds that the Libelant is a corporation, having been organized by an insurance agent, Superintendent of a dredging company, and another interested individual for the purpose of doing salvage work, none of the officers of the Libelant being either experienced mariners or experienced salvage persons, but having on their own a certain theory with respect to removal of shrimp boats. The Court further finds that the Libelant was not licensed as a wrecker on the Florida Coast as provided in 46 U.S.C.A. § 724. The Court finds that the vessels were not in extreme peril, nor but for the services of the Libelant both of said vessels would have been a total loss, because the evidence shows that a representative of the United States Coast Guard was on the scene by the vessels and two Coast Guard Cutters reached the scene over four hours before the next high water and one of said vessels had been previously removed from the beach in South Carolina with the aid of the Coast Guard and members of her crew. The Court further finds that the Beach Salvage Corporation of Florida, the Libelant, was not the only salvor but the United States Coast Guard was also a salvor of the vessels even though, by reason of law, it could not actually receive a portion of any salvage award, 14 U.S.C. § 63 [1]; The Kanawha, 2 Cir., 254 F. 762, and although the Libelant failed to follow Rule 8 in enumerating the United States Coast Guard, said failure was not prejudicial.

■■■ There was an Intervening Libel filed by Diesel Shipbuilding Company for emergency repairs to the "TOM R. JR." in a total amount of $230.43 which the Court finds is reasonable and proper and a lien against the trawler, "TOM R. JR.". The Intervening Libel also alleged or claimed a charge of $391.13 for pumping while it was custodian of the vessel after the filing of the original Libel and before the vessel was removed to Bellinger Ship Yard and permanent repairs made. The Court finds that such charge is reasonable and proper, whether it be considered as a direct obligation of the vessel or as a part of the Marshal's costs to be assessed in this cause and the Court finds that in any event such charge should be paid.

■■■ The Claimant filed a Cross Libel for damages on account of the negligence of the Libelant in placing bridles on the rudder and rudder shoe which was used in the removal of the vessels from the beach and the improper operations of the Libelant which contributed to the

I. Now 14 U.S.C.A. § 88.

damage to the vessels. The Court finds that both of the vessels were damaged in being removed from the beach and the Libelant used little skill in its operations, but since the damage to the vessels will be considered in making any award for salvage and allowance for costs to the Libelant, it will not be considered here. It is true that a salvor is charged with the duty to take reasonable care of the property that it undertakes to save, but even though the Libelant claims to have been a skilled salvor, the Court finds that in fact it was not and will not charge it with the same duty as would be the case if it was in fact a professional salvor or a salvor licensed by this Court under the law. Another feature of the Libelant's claim is of the exaggerated peril and the value of its labor, but as said by Judge Call of this Court in the case of The Copperfield, D.C., 268 F. 77:

"It impresses me that these witnesses systematically endeavored to exaggerate the danger to the property salved as well as to the salving tug and salvors. I suppose this is natural, and is more or less apparent in salvage cases."

The only effect this would have would be to compel an excessive bond, but this Court has already considered that matter and placed the amount of bond on the vessels at $2,500.00 each.

In considering an amount to be awarded for the entire salvage operation, the Court should consider not only the efforts of the Libelant but those of the Coast Guard and the actual necessary expenses incurred by the Libelant, The Kanawha Supra. The Court has considered the table of cases set out in THE LAW OF SALVAGE by Martin J. Norris relative to stranding, which table covers the years 1806 to 1960. A casual observation of those cases discloses that the average amount of award with respect to value of the property salved is less than 10%, even though in many instances vessels were removed from rocks and other very perilous locations. The last reported case in this circuit which relates to conditions of a vessel ashore in the sand was at Nassau Inlet, which is to the North of St. Johns Bar approximately the same distance as these boats were South, same being the case of The Perry Setzer, D.C., 288 F. 209, in which a lumber schooner went ashore in the breakers to the North of Nassau Inlet in a light breeze and a smooth sea, at which time she was leaking. She was removed from the beach by the tugs VOLUNTEER and THREE FRIENDS. She was a four-mast schooner of 1800 tons dead weight, loaded with 830,000 feet of lumber. The value of the cargo on the schooner at that time was $25,000.00 and the schooner itself was valued at $25,-000.00 for a total of $50,000.00. After a day and a half of pumping and pulling she was skillfully removed from the beach and towed to Jacksonville, Florida. The Court there found the VOLUNTEER was engaged some 29 hours and the THREE FRIENDS 27 hours and some 17 to 18 men employed in their service. The Court fixed the salvage award in that instance at $2,000.00. The foregoing case was appealed and affirmed in C.C., 296 F. 700. The Court finds that the entire salvage service rendered by both the Coast Guard and the Libelant on the salved vessels is *$2,000.00*, of which *$1,000.00* is apportioned to the work of the United States Coast Guard Cutter # 95324 and the 40' Coast Guard Cutter and the sum of *$1,000.00* is awarded to the Libelant.

In addition to the above sum awarded to the Libelant, the Libelant should be reimbursed for expenses of the tug boat which towed the "TOM R. JR." from Mayport to Diesel Shipbuilding Company in the amount of $150.00. The Libelant should be reimbursed for the cost of a lost anchor in the amount of $50.00; damage to the dukw in the amount of $25.00 and the other expenses of the Libelant are considered in their portion of the award.

The Libelant is claiming also the cost of three appraisals and it appears to the Court that since these appraisals were made after commencement of this action and the Libelant failed to comply

with the rules of this Court in setting forth the appraisals in its original Libel but did, after making said appraisals, comply with that portion of the rules of this Court, such expense, if any, is to be taken out of the award made to the Libelant.

The record discloses that the Claimant promptly, after the filing of the original Libel, filed her claim to the boats. Exceptions to the Libel, and motions to dissolve for failure of the Libelant to comply with Rule 8 with respect to the value of the boats, names of the salvors, and other violations of the rules, and the Libelant did not file an amended libel complying in part with these exceptions until February 9, 1961; that the Libelant should be assessed as against its share a portion of the custodian's fee on each of said vessels and a portion of the pumping costs on the "TOM R. JR.", which amount is herein fixed at $100.00.

A decree will be entered in accordance with these findings.